PEARSON, J.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH ZINO, JR., *et al.*, | ) | |
| | ) | CASE NO. 5:11CV01676 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| WHIRLPOOL CORPORATION, *et al.*, | ) | **AMENDED** |
| | ) | **MEMORANDUM OF OPINION &** |
| Defendants. | ) | **ORDER** [Resolving Phase One of Trial |
| | | and ECF No. 261] |

## I. **Introduction**

The Court presided over a five-day bench trial for this class action that seeks to determine the fate of company-paid health benefits for more than two thousand retired hourly workers (and their spouses) of the Hoover Company and its successor entities, Maytag Corporation and Whirlpool Corporation (each, in the alternative, "the Company"). The class members ("Retirees") all retired between 1980 and 2007. During their years of employment, Retirees built Hoover-brand floor care products at manufacturing plants in the Canton, Ohio, area, and they were unionized and represented by the International Brotherhood of Electrical Workers Local No. 1985 ("the Union").

This lawsuit is driven by Retirees' contention that the collective bargaining agreements ("CBAs") negotiated between the Company and the Union over the years entitle them to "specified retiree health benefits that are not subject to unilateral reduction or termination during retirement." ECF No. 146 at 16. In Retirees' view, Defendant Whirlpool's[1] actual and planned reductions of their

---

[1] The named defendants are Whirlpool Corporation and Whirlpool Corporation Group

(continued...)

(5:11CV01676)

health benefits violate the CBAs and is actionable under § 301 of the Labor Management Relations Act ("LMRA")[2] and § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA").[3] Retirees therefore request that the Court: declare that their health benefits may not be unilaterally reduced or terminated; permanently enjoin Whirlpool from reducing or terminating their benefits; and award damages as well as other remedies.  ECF No. 146 at 20-21.

The bench trial was held to decide one narrow question: Have Retirees proven by a preponderance of the evidence that the governing CBAs entitle them to receive retiree health benefits for life?  ECF No. 226 at 3.  The Court ruled that it would first decide this threshold question (whether the retiree health benefits are "vested" for life) before turning to the remaining issues, if necessary: whether Whirlpool may unilaterally reduce the retiree health benefits if indeed they are vested for life, and, if so, whether the scope and magnitude of Whirlpool's actual and planned reductions are contractually permitted under the CBAs.[4]  ECF No. 226 at 3.

---

[1](...continued)
Benefit Plan for Retirees (collectively, "Whirlpool").

[2] Section 301(a) of the LMRA provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).

[3] Section 502(a)(1)(B) of ERISA provides: "A civil action may be brought–(1) by a participant or beneficiary–. . . (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ."  29 U.S.C. § 1132(a)(1)(B).

[4] Retirees have moved for the Court to issue an order requiring Whirlpool to proffer evidence regarding whether Whirlpool may unilaterally reduce the retiree health benefits, and, after the proffer, for the Court to "determine whether it has sufficient evidence to decide the . . .

(continued...)

(5:11CV01676)

The Court heard testimony from numerous witness and reviewed the voluminous exhibits admitted into evidence.  The Court has also considered the parties' post-trial briefs which proposed findings of fact and conclusions of law.  ECF Nos. 260, 265, 272.  The Court hereby issues its factual findings and legal conclusions in this memorandum of opinion and order.

## II. Factual & Procedural Background

The factual and procedural background of this case was summarized in the Court's summary judgment ruling.  *See Zino v. Whirlpool*, No. 5:11CV01676, 2013 WL 4544518 (N.D. Ohio August 27, 2013).  The retiree health benefits at issue are governed by a series of CBAs negotiated between the Company and the Union.  *Id.* at *1.  The CBAs include the following documents: Basic Labor Agreements ("BLAs") that set forth the parties' essential rights and obligations with respect to the employment relationship; Exhibit A-1 Welfare Plans for Hourly-Rated Employees ("Welfare Plans") that described the health insurance coverages provided to hourly employees; Exhibit A-2 Pension Plans for Hourly-Rated Employees ("Pension Plans") that established the terms under which hourly employees may receive pension benefits upon retirement; and other supplemental contracts known as Contract Settlements.  *Id.* at *1 and *7.

Company and Union negotiations occurred in conjunction with several key organizational changes.  *Zino*, 2013 WL 4544518 at *2.  In 1989, Hoover was purchased by Maytag and became a division of that company.  *Id.*  Then, in 2006, Maytag merged into Whirlpool.  *Id.*  Not long after the merger, on January 31, 2007, Whirlpool sold the Hoover floor-care business to Techtronic

_____

[4](...continued)
issue without the necessity of an additional hearing or trial."  ECF No. 262 at 1.  The Court declines to do so in a separately issued order.

(5:11CV01676)

Industries Co., Ltd. ("TTI"), a foreign company that shut down most of the Hoover manufacturing operations in the Canton area. *Id.* As part of the sale agreement with TTI, Whirlpool retained the liabilities associated with retiree health benefits for Hoover employees who retired prior to the January 31, 2007 sale. *Id.* Every Retiree in this lawsuit retired before January 31, 2007, and has received company-sponsored health benefits without interruption since retiring. *Id.* at *1.

In May, 2011, Whirlpool delivered notices to Retirees announcing its plans to significantly reduce their health benefits and its right "at its, discretion, to charge or terminate all or any part of the benefits offered at any time and in any manner." *Zino*, 2013 WL 4544518 at *2. Also, in 2011, Whirlpool unilaterally increased co-payments for prescription drug benefits for Medicare-eligible Retirees. *Id.* Whirlpool's actual and planned reductions are estimated to decrease the present value of Retirees' current health benefits from $169 million to $43 million–an approximately 75% decrease in the present value of the retiree health benefits in question. *Id.*

After this lawsuit was filed, the Court certified a class action and ordered the creation of four distinct subclasses. *Zino*, 2013 WL 4544518 at *3. Each subclass shares the same core characteristics in that they are compromised of former employees of Hoover, Maytag, or Whirlpool, who were represented by the Union in collective bargaining and who, after retirement, received health care benefits, as well as their spouses and surviving spouses. *Id.* The subclasses are distinguished by the following time periods in which the former employees retired:

(1) after April 18, 1980, but before April 19, 1983 (Subclass A);

(2) after April 18, 1983, but before January 1, 1993 (Subclass B);

(3) after December 31, 1992, but before December 8, 2003 (Subclass C); and

4

(5:11CV01676)

(4) after December 7, 2003, but before January 31, 2007 (Subclass D).[5]  *Id.*

### III. <u>Sixth Circuit Vesting Law</u>

Here, it is appropriate and instructive for the Court to repeat its articulation of the Sixth

Circuit's vesting jurisprudence from the Court's summary judgment ruling:

> There are two types of employee benefit plans: pension plans and welfare benefit
> plans. *Cole v. ArvinMeritor, Inc.*, 549 F.3d 1064, 1069 (6th Cir. 2008).  Although
> pension plans are subject to mandatory vesting under ERISA, welfare benefit
> plans–which include retirement benefit plans–are not.  *Id.*; *see In re White Farm
> Equipment Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986) ("Congress expressly exempted
> employee welfare benefit plans from stringent vesting, participation, and funding
> requirements").  Rather, retirement benefits typically vest "only if the parties so
> intended when they executed the applicable labor agreements." *Cole*, at 1069.
>
> An employer is "free to terminate any unvested welfare benefits upon the expiration
> of the relevant CBA." *Noe v. PolyOne Corp.*, 520 F.3d 548, 552 (6th Cir. 2008).  "An
> employer that contractually obligates itself to provide vested healthcare benefits
> [however] renders that promise 'forever unalterable.'" *Moore v. Menasha Corp.*, 690
> F.3d 444, 450 (6th Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 1643, 185 L. Ed.2d
> 618 (2013).  Thus, if a welfare benefit has vested, the employer's unilateral reduction
> of that benefit breaches the CBA, creating a right of action under the LMRA.  *Yolton
> v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571, 578 (6th Cir. 2006), *cert. denied*,
> 549 U.S. 1019, 127 S. Ct. 554, 166 L. Ed.2d 410 (2006).  In such an instance, ERISA
> is violated, as well.  *See Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir.
> 1991) ("if it is the intention of the parties to confer on retirees vested rights in
> medical insurance benefits under a CBA, it is also their intention to confer the same
> rights under the 'welfare benefit plan' protected by ERISA"); *see also Moore*, at 450
> ("the LMRA claim also creates a derivative ERISA claim, because the disputed
> healthcare benefits were agreed upon pursuant to a union-negotiated contract").
>
> "Significantly, in this circuit, a court may find vested welfare benefits under a CBA
> even if the intent to vest has not been explicitly set out in the agreement." *Bender v.
> Newell Furnishings, Inc.*, 681 F.3d 253, 261 (6th Cir.), *cert denied*, __ U.S. __, 133

---

[5] Counsel for Retirees submitted a declaration stating that documents obtained during
discovery show that the Subclass A includes 31 members; Subclass B includes 418 members;
Subclass C includes 1104 members; and Subclass D includes 634 members.  ECF No. 136-1 at 4.
The size of each subclass as of the time of this decision may be slightly different.

(5:11CV01676)

S. Ct. 436, 184 L.Ed.2d 260 (2012). And, in this circuit, any discussion of whether benefits vested under a CBA must begin with the analytical framework articulated in *Yard-Man*. As summarized by one Sixth Circuit panel:

> Under *Yard-Man*, basic rules of contract interpretation apply, meaning that courts must first examine the CBA language for clear manifestations of an intent to vest. [*U.A.W. v. Yard-Man*, 716 F.2d 1476, 1479 (6th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).] Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and 'the relative positions and purposes of the parties.' *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. Our decision in *Yard-Man* also explained that 'retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.' *Id.* at 1482. With regard to the '*Yard-Man* inference,' later decisions of this court have clarified that *Yard-Man* does not create legal presumption that retiree benefits are interminable. *Yolton*, 435 F.3d at 579. Rather, *Yard-Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*

*Noe*, 520 F.3d at 552. *Yard-Man* explained that the "inference" makes sense because employees are aware that the union owes no obligation to bargain for continued benefits for retirees, and, if they forego wages now in expectation of retiree benefits, which are typically understood as a form of delayed compensation or reward for past services, "they will want assurances that once they retire they will continue to receive such benefits regardless of the bargain reached in subsequent agreements." 716 F.2d at 1482. While the precise weight of the *Yard-Man* inference has been characterized as "elusive"; *Reese* [*v. CNH America LLC*, 574 F.3d 315, 321 (6th Cir. 2009)]; recent cases have "described the inference as acting like a 'thumb on the scales' or 'nudge' in favor in favor of vesting." *Bender*, 681 F.3d at 262; *see Moore*, 690 F.3d at 450 (inference "requires 'a nudge in favor of vesting' in close CBA cases").

*Yard-Man* has also been influential for its instruction to "look to other provisions of the agreement for guidance" when the explicit language is ambiguous as to intent. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir.), *cert. denied*, 519 U.S. 807, 117 S. Ct. 49, 136 L.Ed.2d 13 (1996). Thus, post-*Yard-Man* cases have recognized, for example, that an intent to vest health benefits may be discerned where the CBA ties the eligibility to receive retirement health benefits to the eligibility to receive a pension, which is a lifetime benefit. *See Witmer v. Acument Global Technologies,*

(5:11CV01676)

*Inc.*, 694 F.3d 774, 776 (6ᵗʰ Cir. 2012) ("[l]anguage tying health care benefits to retirement-income benefits, we have held, demonstrates the parties' intent to create vested healthcare benefits"); *Noe*, 520 F.3d at 553 ("provisions in the [CBAs] expressly tie eligibility to retiree health benefits to eligibility for a pension, which we have repeatedly held evinces an intent to vest"); *Yolton*, 435 F.3d at 584-85 ("[t]he language tying health care benefits to pension benefits and the context of the bargaining demonstrate an intent to provide lifetime benefits"); *McCoy v. Meridian Automotive Systems, Inc.*, 390 F.3d 417, 422 (6ᵗʰ Cir. 2004) ("[b]ecause the Supplemental Agreement ties eligibility for retirement-health benefits to eligibility for a pension . . . there is little room for debate that the retirees' health benefits vested upon retirement"); *Golden*, at 656 ("[s]ince retirees are eligible to receive pension benefits for life," tying retirement health benefits to pension eligibility indicates "that the parties intended that the company provide lifetime health benefits as well").

Differences in the way duration limits are written in an agreement may also create a vesting footprint. *Yard-Man* explained that "[v]ariations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous." 716 F.2d at 1480. Therefore, "[t]he Sixth Circuit has consistently held that the inclusion of specific durational limitations in some provisions, but not others, suggest that benefits 'not so specifically limited, were intended to survive.'" *Moore*, 690 F.3d at 457; *see Reese*, 574 F.3d at 322 (applying principle to find that retirees were given right to lifetime health benefits); *Noe*, 520 F.3d at 562 ("[t]he presence of specific durational language in other provisions and its absence in the retiree health benefits provisions suggests an intent to vest under our case law."); *Yolton*, 435 F.3d at 582 (specific duration limits regarding benefits for workers on layoff and on maternity leave, but not for benefits for retirees, indicates vesting of retirement benefits). Other clues within the agreement may be significant, as well. *See, e.g.*, *Yolton*, at 581 (similarity in duration language for pension benefits and health benefits supports finding that latter is vested).

*Zino*, 2013 WL 4544518 at *5-*6.[6]

---

[6] The Court notes that, after the bench trial was held, the United States Supreme Court granted the petition for writ of certiorari filed for *Tackett v. M&G PolymersUSA, LLC*, 733 F.3d 589 (6ᵗʰ Cir. 2013), in order to resolve the following question:

Whether, when construing collective bargaining agreements in Labor Management Relations Act (LMRA) cases, *courts should presume that silence concerning the duration of retiree health-care benefits means the parties intended those benefits to*

(continued...)

(5:11CV01676)

A tandem of Sixth Circuit cases departed from the traditional inquiry and identified two distinct issues pertinent to the question of whether retirees were conferred vested health benefits: (1) whether, based on established Sixth Circuit vesting principles, the CBA in that case granted the retirees "a right to lifetime health benefits" such that it "prevents an employer from *terminating* the benefits"; and (2) whether, based on the particular circumstances of the case, "an employer [may or] may not *alter* the benefits in any way" even if the retirees were promised health benefits for life. *Reese*, 574 F.3d at 322-23 ("*Reese I*") (emphases in original); *see Reese v. CNH America LLC*, 694 F.3d 681, 682 (6th Cir. 2012) ("*Reese II*") (*Reese I* "considered two questions: 'Did [CNH] in the 1998 CBA agree to provide health-care benefits to retirees and their spouses for life?  And, if so, does the scope of this promise permit CNH to alter these benefits in the future?'").  As discussed, this decision will address only the first phase of the vesting inquiry.

---

[6](...continued)
*vest (and therefore continue indefinitely), as the Sixth Circuit holds*; or should require a clear statement that health-care benefits are intended to survive the termination of the collective bargaining agreement, as the Third Circuit holds; or should require at least some language in the agreement that can reasonably support an interpretation that health-care benefits should continue indefinitely, as the Second and Seventh Circuits hold.

ECF No. 301 at 1 (emphasis added).  The Supreme Court's granting of the petition presents the possibility that the Sixth Circuit's vesting law might be invalidated.  Nonetheless, the parties informed the Court during a May 12, 2014 telephone conference and in subsequent briefs that they do not believe that this case should be stayed pending the Supreme Court's decision in *Tackett* and that the Court should proceed to decide all of the outstanding issues in this case.  *See* docket entry of May 12, 2014 and ECF Nos. 304 at 6; 305 at 4.

(5:11CV01676)

## IV. Discussion

The Court will issue its rulings beginning with Subclass C, then proceed to Subclass D, Subclass A, and Subclass B.[7]

### A. Subclass C

Health benefits for Retirees who retired after December 31, 1992, but before December 8, 2003, are governed by the 1992-1995, 1995-2000, and 2000-2003 CBAs.[8]  These CBAs established the opportunity for the 1992-2003 Retirees to continue company-paid health benefits during retirement.  The question before the Court is whether these CBAs also created vested, lifetime rights to such benefits.

In its summary judgment ruling, the Court concluded that there was strong evidence based on the language of the CBAs as well as the extrinsic evidence showing that the parties intended to confer health benefits to Retirees for life.  *See Zino*, 2013 WL 4544518 at *11-*17.

#### 1. Contract Language

Section 3.01(c)(iii) of the 1992-1995, 1995-2000, and 2000-2003 Welfare Plans provided in relevant part:

> In the case of an employee who retires on or after January 1, 1993, under the terms of the Pension Plan for Hourly-Rated Employees and who has at least ten years of

---

[7] The Court granted Whirlpool's motion for summary judgment with respect to Subclass B.  *See Zino*, 2013 WL 4544518 at *28.  Based on the evidence presented at trial, the Court will grant Retirees' motion for reconsideration of and/or relief from entry of summary judgment as to that subclass.  *See* ECF No. 261.  The Court's decision will be explained in detail below.

[8] The original term of the CBA negotiated in 2000 was from 2000 to 2005.  *See* Joint Exhibit 42.  The parties, however, elected to enter into the next round of negotiations early and negotiated a superseding CBA with a term of 2003 to 2008.  *See* Joint Exhibit 50.

9

(5:11CV01676)

> pension credit accumulated after attaining the age of 45 (or was born prior to
> December 31, 1937), and who had active employee coverage in effect on the day
> immediately preceding retirement, such employee shall have the opportunity to
> continue elements of the medical insurance in accordance with the following
> principles:
>
> (A) A monthly contribution shall be required as follows for coverage prior to the
> covered person's attainment of age 65:

| Years of Pension Credit at Retirement | Per Person Contribution | Family Maximum Contribution |
|---|---|---|
| More than 30 | $0 | $0 |
| 20-30 | $10 | $20 |
| 10-20 | $15 | $30 |

> (B) Eligible retired employees who were hired prior to July 8, 1988, will be eligible
> to retain Basic and Major Medical coverage, provided that the Major Medical
> lifetime maximum benefit shall be $50,000.[9] . . .
>
> (C) Eligible retired employees who were hired after July 8, 1988, will be eligible to
> retain the Comprehensive Plan.

Joint Exhibits 30 at 30; 36 at 32-33; 42 at 32-33.  The Basic, Major Medical, and Comprehensive

Plan coverages are described in § 2.06.  Joint Exhibits 30 at 8-24; 36 at 8-24; 42 at 9-25.  Based on

the above provisions, the eligibility of the 1993-2003 Retirees to receive company-paid health

benefits was unequivocally tied to their receipt of pension benefits.  In order to continue company

insurance coverage during retirement, these Retirees must have retired "under the terms of the

Pension Plan" and have had "at least ten years of pension credit accumulated after attaining the age

---

[9] The $50,000 amount was set forth in the 1992-1995 Welfare Plan.  That figure was
increased to $60,000 in the 1995-2000 Welfare Plan, and increased again to $70,000 in the 2000-
2003 Welfare Plan.

(5:11CV01676)

of 45 (or [have been] born prior to December 31, 1937) . . . ."  Under Sixth Circuit vesting rules, this

is strong evidence "demonstrat[ing] the parties' intent to create vested healthcare benefits." *Witmer,*

*649 F.3d at 776*; *see Noe, 520 F.3d at 553*; *Yolton, 435 F.3d at 584-84*; *McCoy, 390 F.3d at 422*.

In addition, in comparison with the absence of any duration limitations with respect to retiree

health benefits, other types of benefits provided under the 1992-1995, 1995-2000, and 2000-2003

Welfare Plans had clearly defined duration limits.   For example: (1) life insurance coverage

"terminates thirty-one days after the date of separation from active employment" unless otherwise

provided; (2) in the case of employees who are laid off, life insurance "will be continued for a period

of three (3) months following the month of layoff"; (3) Accidental Death and Dismemberment

Insurance "will automatically terminate upon separation from active employment"; (4) health

insurance will terminate after separation from employment "provided that coverage shall be extended

for an additional month in the case of a layoff"; (5) if an employee or a dependent is totally disabled

at the time insurance terminates, the Basic Medical Expense Plan, the Prescription Drug Plan, Dental

Insurance, and Vision Care Plan "will be extended for up to three (3) months" and the Major Medical

Benefits will continue to be available during the time of disability "for a maximum period of twelve

(12) months beyond the date on which insurance terminates"; (6) in the event of an employee's

death, the Company will provide health insurance coverage to eligible dependents, and such

coverage will continue for different specified periods depending upon the amount of pension credit

earned by the deceased employee; (7) if an employee is absent for longer than two weeks due to an

illness or injury, Accidental Death and Dismemberment Insurance coverage will continue in effect

"until the end of the sixth policy month following the policy month in which disability occurred,"

(5:11CV01676)

and Sickness and Accident benefits will be payable "up to the maximum of 26 weeks"; and (8) if an employee is absent for longer than two weeks due to illness or injury, health insurance coverage "will continue during a period of six (6) months following the month in which the disability occurred for non-occupational illness or injury and eighteen (18) months following the month in which disability occurred for occupational illness or injury . . . ." Joint Exhibits 30; 36; 42.  Consequently, the presence of contractual language specifically denoting time limitations for numerous employee welfare benefits but not for retiree health benefits is, again, compelling evidence that the "benefits 'not so specifically limited, were intended to survive.'" *Moore*, 690 F.3d at 457; *Reese I*, 574 F.3d at 322; *Noe*, 520 F.3d at 562; *Yolton*, 435 F.3d at 582.

Furthermore, § 3.01(c)(iii)(F) of the 2000-2003 Welfare Plan gave Retirees the option of enrolling in an Alternative Medical Plan instead of receiving coverage through the Basic and Major Medical Plan or the Comprehensive Plan.  Joint Exhibit 42 at 34.  Alternative Medical Coverage provided coverage through Health Maintenance Organizations ("HMOs") and Preferred Provider Organizations ("PPOs").  Joint Exhibit 42 at 26.  Although the 2000-2003 Welfare Plan expressly gave the Company the right to "cease offering the Alternative Medical Coverage on the annual re-enrollment date," there is no language in the 1992-1995, 1995-2000, and 2000-2003 Welfare Plans giving the Company a similar right to terminate the Basic and Major Medical and Comprehensive coverages for Retirees.  Joint Exhibit 42 at 26; *see generally* Joint Exhibits 30; 36; 42.

In spite of numerous indications within the CBAs that the parties' intended for the 1992-2003 Retirees to receive health benefits for life, the Court denied Retirees' motion for summary judgment with respect to Subclass C due to an ambiguity in the contract language that was not definitively

12

(5:11CV01676)

resolved by the extrinsic evidence.  Section 3.01(c)(iii) of the 1992-1995, 1995-2000, and 2000-2003

Welfare Plans–the section tying eligibility for retiree health benefits to receipt of pension benefits–

promised that eligible retirees shall have the "opportunity" to continue medical insurance coverage

during retirement.  The Court interpreted the word "opportunity" to suggest that "those retirees

meeting the eligibility requirement received, at most, the promise of being placed in a 'suitable or

favorable' position to receive healthcare benefits, not an absolute promise of the benefits

themselves."  *Zino*, 2013 WL 4544518 at *16.  Retirees argued that the word "opportunity" did not

diminish the obligatory nature of the promise, rather, the term merely indicated that Retirees'

entitlement to health benefits was contingent upon their payment of the monthly contributions

required under § 3.01(c)(iii)(a).  *Id.*  While the Court found this interpretation reasonable, the Court

determined that a reasonable argument could be made that "opportunity" conveyed another meaning,

that is, Retirees' payment of contributions was merely another necessary, but not sufficient, condition

to their receipt of health benefits.  *Id.*  As a result of this conclusion, and the existence of disputed

facts based on the extrinsic evidence, the Court permitted the issue to proceed to trial.

2. <u>Trial Evidence</u>

The evidence presented at trial puts to rest any ambiguity in the language of § 3.01(c)(iii).

Timothy Schiltz, the author of § 3.01(c)(iii) in the 1992-1995, 1995-2000, and 2000-2003 Welfare

Plans, testified that he did not intend the word "opportunity" to create any negative or unfavorable

conditions for Retirees.  ECF No. 259 at 73.  To the contrary, according to Schiltz, "all [he] meant"

for that word to convey was the promise that company-paid health insurance was a benefit that

Retirees "could take advantage of . . . if they meet the qualifications and follow the appropriate

13

(5:11CV01676)

process."  ECF No. 259 at 73.  Notably, prior to 1992, the Welfare Plans did not contain §

3.01(c)(iii) and did not expressly confer health benefits for retired employees.  Joint Exhibit 23.

Moreover, from 1992 to 2003, Schiltz held the positions of Director and Vice President of Human

Resources for the Company, and was actively involved in the Company's negotiations with the

Union in 1992, 1995, and 2000.  ECF Nos. 255 at 9, 77; 259 at 47, 61, 84.  Given Schiltz's high

standing within the Company, his direct involvement in Company and Union negotiations, and his

authorship of Welfare Plan language that, for the first time, expressly communicated the promise of

retiree health benefits, the Court finds Schiltz's testimony regarding the meaning of § 3.01(c)(iii) to

be highly reliable.  In fact, there could hardly have been a more trustworthy witness than Schiltz,

who was steadily employed by Hoover, Maytag, and Whirlpool for more than twenty-five years, who

harbored no ill-feelings towards his former employers, and who, unlike some of the witnesses called

to testify by Retirees, had nothing to gain from his testimony at trial.  ECF No. 255 at 8.

Other testimony by Schiltz bolsters the conclusion that the 1992-2003 Retirees were

contractually promised health benefits for life.  Schiltz acknowledged that during the 1992 contract

negotiations, he told Union representatives: "Everybody in this room, we made a *promise* that when

you retire, *you're going to have retiree medical insurance*.  So we have to estimate what the value

of that is.  The value of the total *promise*, and put that to the books now."  ECF No. 259 at 49

(emphases added).  This revealing statement was made to Union representatives one week prior to

the effective date of the 1992-1995 Welfare Plan, which, as discussed, contains language written by

Schiltz formally conferring upon retiring employees the opportunity to continue their company-

funded health insurance during retirement.  *See* Joint Exhibit 30 at 5; Plaintiff's Exhibit 35 at 91.

14

(5:11CV01676)

There is no dispute that all Retirees, including the 1992-2003 Retirees who are members of Subclass C, have continued to receive health benefits without interruption since the date they retired. Schiltz testified that the provision of these benefits by the Company were "responsibilities [that] came from a contract."  ECF No. 255 at 102.  Schiltz also unequivocally testified that "the intent" of the Company and the Union was to negotiate an agreement that provided health benefits to Retirees *for life*.  ECF No. 255 at 90.  Although Schiltz was referring to the understanding between the Company the Union back in 1985, Schiltz testified that this understanding had existed since 1980, and was carried over into each CBA through 1992, when the Welfare Plan formally memorialized, in writing, the agreement to provide health benefits to eligible retirees.  ECF No. 259 at 8-10, 18-26.

The Court therefore finds that the 1992-2003 Retirees, Subclass C, were promised lifetime, company-paid health benefits under the 1992-1995, 1995-2000, and 2000-2003 CBAs.  Although application of the *Yard-Man* inference further strengthens this conclusion, that inference is not needed for the Court to arrive at its conclusion.  Subclass C prevails at this stage of the litigation.

None of the evidence presented by Whirlpool supports a contrary finding.  In its post-trial briefs, Whirlpool merely repeats numerous arguments that were thoroughly analyzed and rejected in the Court's summary judgment ruling.  For example, Whirlpool argues that: (1) all of the Welfare Plans governing the health benefits of Retirees incorporated documents known as Groups Insurance Plans ("GIPs") that contain reservation of rights ("RORs") language stating that the health insurance program "may be changed or discontinued"; (2) 1992-2003 Retirees and 2003-2007 Retirees, upon retiring, signed legally binding Authorization Forms with language disclaiming that "[t]he premium

15

(5:11CV01676)

cost of, share of premium cost, and the medical coverage are all subject to change"; (3) duration

clauses that did not specifically mention retiree health benefits nevertheless limited the promise of

retiree health benefits to the term of each CBA; (4) the 1992-2003 Retirees did not earn or accrue

their health benefits, and, consequently, the *Yard-Man* inference does not apply; and (5) the Welfare

Plans did not promise health benefits to Retirees after the age of 65.  *See* ECF Nos. 265; 272.  The

Court need not repeat its lengthy discussion rejecting these arguments and rests on the analysis

articulated in its prior ruling.  *See Zino*, 2013 WL 4544518 at *15, *21-*25.

Whirlpool additionally argues that, even if the GIPs were not incorporated into the Welfare

Plans, the existence of the ROR language in the GIPs is evidence showing that Retirees understood

that retiree health benefits were unilaterally terminable.  ECF No. 272 at 41.  The GIPs were booklets

published by the Company over the years and distributed to its hourly employees "to describe the

group insurance program."  *See, e.g.*, Joint Exhibit 71 at 3.  All of the pertinent Welfare Plans in this

case referred to–but did not incorporate[10]–GIPs as "descriptive booklets [that] will be furnished to

each covered employee."  *See, e.g.,* Joint Exhibit 30 at 5.  As evidence that Retirees fully understood

and acquiesced to the Company's prerogative to terminate retiree health benefits, Whirlpool points

out that a number of Union officials, including Thomas Cook, James Gensley, and Jim Repace,

testified that they never filed a grievance over the ROR language contained in Company-published

materials such as the GIPs.  ECF Nos. 251 at 82, 199; 252 at 225; *see* ECF No. 255 at 17.

---

[10] The Sixth Circuit requires "explicit language of incorporation" before a descriptive booklet may be incorporated into a CBA. *Bender*, 681 F.3d at 264 (rejecting incorporation argument where, as here, "the CBAs refer to a 'booklet and policy,' but do not include any explicit language of incorporation").  None of the Welfare Plans in this litigation explicitly incorporated the GIPs even though they referenced the GIPs.

16

(5:11CV01676)

Cook, Gensley, and Repace each explained, however, that they saw no reason to grieve the ROR language because it was contained in Company-published documents that were not part of the negotiated CBAs, and, in any event, the Company never attempted to significantly reduce retiree health benefits until the 2011 announcement that resulted in the filing of this lawsuit. ECF Nos. 251 at 82, 199; 252 at 225. Their testimonies are persuasive. Unlike the Welfare Plans, the GIPs were not contract documents and therefore did not govern retiree health benefits. And, as Cook testified, it was prudent not to pursue a grievance until there was "an actual dispute" because otherwise "you'd either be in arbitration or in court seven days a week." ECF No. 251 at 159. A disclaimer in a non-negotiated document did not constitute "an actual dispute," in the eyes of Union representatives, and they reasonably chose not devote their time and resources to fight an issue that neither altered the promises granted under the CBAs nor affected the actual provision of benefits at the time.

The Court acknowledges that, in Schiltz's opinion, the ROR language, *i.e.*–"[t]he Hoover Company intends to continue the program indefinitely, but, as well all group plans, the program may be changed or discontinued"[11]–was not inaccurate. ECF No. 255 at 16-17. When viewed in context, however, Schiltz's opinion is not inconsistent with his testimony that Retirees were promised lifetime health benefits. Schiltz testified that when he was asked by Union members whether the Company could ever terminate retiree health benefits, he responded that "healthcare benefits did not enjoy the same level of protection as a pension does." ECF No. 259 at 43. Schiltz explained that,

---

[11] This ROR language remained substantially the same in the GIPs published between 1980 and 2002. ECF No. 265 at 15-16.

17

(5:11CV01676)

in the event the Company filed for bankruptcy, pension benefits, but not retiree health benefits, would be protected by the Pension Benefit Guaranty Corporation.  ECF No. 259 at 43.

Thus, according to Schiltz, retiree health benefits might be "discontinued" if the Company no longer had any assets to pay for them.  That retiree health benefits might be discontinued in this extreme and limited scenario does not imply that Retirees were not contractually promised health benefits for life.  Schiltz's testimony demonstrates that Retirees did in fact receive such a promise.

Next, Whirlpool argues that the Exhibit A-2 Pension Plan implemented in 1984 undermines the "tying" inference for at least some of the 1992-2003 Retirees and therefore demonstrates that their health benefits are not vested for life.  ECF No. 265 at 67.  The 1984 Pension Plan states that "[i]nclusion in the Plan will not give any Employee the right to be retained in the service of the Company nor any right or claim to a pension or other benefit unless and until specifically granted under the terms of the Plan."  Joint Exhibit 13 at 33.  Because there is no evidence that a new Pension Plan was implemented for the 1986, 1988, or 1992 contract cycles, Whirlpool reasons that (1) the 1984 Pension Plan applied to the 1992-1995 contract term, and (2) the language of the 1984 Pension Plan precludes the inference created by the tying of retiree health benefits to pension benefits in the 1992-1995 Welfare Plan that employees who retired between 1992 and 1995 were promised health benefits for life.  ECF No. 265 at 67.

Whirlpool's argument falters because it fails to distinguish the difference between the *giving* of a right and the *inference* of a right.  True: the 1984 Pension Plan did not *give* pensioners an additional right to receive lifetime health benefits.  That fact does not preclude, however, the Court from *inferring*, based on Sixth Circuit vesting principles, the promise of lifetime health benefits

18

(5:11CV01676)

based on language in the 1992-1995 Welfare Plan tying eligibility to receive retiree health benefits

to eligibility to receive a pension.  Moreover, to the extent that there is a conflict between the 1992-

1995 Welfare Plan and the 1984 Pension Plan, that conflict is resolved by the evidence presented at

trial demonstrating that the 1992-2003 Retirees are entitled to lifetime health benefits.  *See Royal*

*Ins. Co. of America v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008) ("[t]he

jury thus uses extrinsic parol evidence to resolve conflicting terms and meanings" within contract).

The Court also rejects Whirlpool's claim that "[n]one of the Exhibit A-1s (standing alone)

have ever contained language providing that the spouses of retirees or the surviving spouses of

retirees would receive healthcare benefits."  ECF No. 265 at 41.  As discussed, § 3.01(c)(iii) of the

1992-1995, 1995-2000, and 2000-2003 Welfare Plans gave eligible retirees the opportunity to

continue their health coverages under either the Basic and Major Medical plan or the Comprehensive

plan.  Sections 2.06(a)(v), 2.06(b), and 2.06(d), which described those coverages, expressly provided

that spouses were included in the coverage.  Joint Exhibits 30 at 8-24; 36 at 8-24; 42 at 9-25.  Indeed,

Schiltz testified at trial that the Company paid for the health benefits of Retirees' spouses and

surviving spouses because there was a contractual agreement to do so.  ECF No. 259 at 76.

### 3. Subclass C Conclusion

The Court finds that the members of Subclass C were promised lifetime, company-paid

health benefits under the 1992-1995, 1995-2000, and 2000-2003 CBAs. The arguments and evidence

presented by Whirlpool do not support a contrary finding.  Subclass C prevails at this juncture.

19

(5:11CV01676)

**B. Subclass D**

Although the CBA negotiated in 2000 was intended to last until 2005, the Union and the Company entered into early negotiations in 2003 because the Company was experiencing financial distress and was contemplating shutting down the Canton manufacturing facilities. ECF No. 253 at 24. A new Welfare Plan was negotiated that year with changes favoring the Company with respect to the distribution of retiree health benefits. ECF Nos. 252 at 155; 255 at 43.

    1. <u>Contract Language</u>

Section 3.01(c)(iv) of the 2003-2008 Welfare Plan provided: "With regard to qualifying employees who retire subsequent to December 9, 2003, the available medical benefits shall be those summarized in Exhibit 5." Joint Exhibit 50 at 22.

Exhibit 5 is reproduced as follows:

**RETIREMENT HEALTH CARE**

| | Eligibility | Benefit | Comments |
|---|---|---|---|
| **Group #1** | Age 55 or more with at least 10 years of pension credit as of 12/31/03 | • Retiree health. No change if retired by 12/31/04 | Window Closes 1/31/04 |
| **Group #2** | Age 55 or more and 10 or more years of pension credit by 6/5/05, but not in Group #1, or in Group 1 and not retired by 1/31/04 | • Retiree health: No change | • Regular Retirement<br>• Grandfathered to 6/29/08 |

20

(5:11CV01676)

| Group #3 | 85 points and 30 or more years of pension credit by 6/29/05, but not in Group #1 or #2 | • Access only to retiree health care. $10,000 lump sum payment<br><br>• Or, if qualified by 6/5/05, may retire after 6/5/05 upon reaching eligibility requirements (e.g., 55 with 10 years) with the following health care:<br>- Cost share of 20% (of 80/20 plan)<br>-No change in current coverage<br>-Pre-65 coverage only | • Window until 6/29/05, pension only (no retiree health care)<br><br>- or -<br><br>• If qualified by 6/5/05 and retiring after 6/5/05, 20% cost share for medical to age 65. |
|---|---|---|---|
| Group #4 | Pension credit as described to the right as of 12/31/03 | Pension Credit (Years)<br><br>30 or more<br>29<br>28<br>27<br>26<br>25<br>24<br>23<br>22<br>21<br>20 | Retiree Health Cost Share<br><br>20%<br>23%<br>26%<br>29%<br>32%<br>35%<br>38%<br>41%<br>44%<br>47%<br>50%<br><br>• No window<br>• Retiree health care is $200 80/20, pre-65 only<br>• Retiree Rx drug is Maytag Model |
| Group #5 | Not eligible under Group #1, #2, #3 or Group #4 above as of 12/31/03 | • Access only to pre-65 retiree healthcare | |

21

(5:11CV01676)

| **Group #6** | Employees hired after 1/1/04 | • Access only to pre-65 retiree healthcare | |

Joint Exhibit 50 at 22.  While no evidence was presented at trial with respect to the size of each of

the six groups identified in Exhibit 5, counsel for Retirees informed the Court that the "vast

majority" of Subclass D belong to Groups 1 and 2; "[o]nly a relatively small number of people"

belong to Groups 3, 4, and 5, because these groups include shorter-service employees many of whom

were not employed long enough to gain pension eligibility; and no one belongs to Group 6 because,

to counsel's knowledge, no one to was hired after January 1, 2004.  ECF No. 251 at 29-30.

### 2. Trial Evidence

#### i. Groups 1 and 2

Repace, as the President and Chief Spokesman of the Union from 1993 to 2008, negotiated

the details of Exhibit 5 on behalf of the Union and was able to offer, through his trial testimony,

clarity as to their meaning.  ECF No. 252 at 89, 91, 124.  According to Exhibit 5, the benefits

accorded to members of Groups 1 and 2 were "Retiree health . . . No change."  Repace testified that

the members of Groups 1 and 2 were promised the same benefits that were promised to those who

retired under the "old rules," that is, the rules in place established by the 1992-1995, 1995-2000, and

2000-2003 Welfare Plans applicable to Subclass C.  ECF No. 252 at 127-28.  His testimony matches

that of Schiltz, who negotiated Exhibit 5 on behalf of the Company.  ECF No. 259 at 39, 59.  Schiltz

testified in his Rule 30(b)(6) deposition that, with respect to Groups 1 and 2, the Company acceded

to the Union's demand to give "people who were on the verge of retirement . . . the opportunity to

essentially get out under the old rules."  Plaintiffs' Exhibit 25 at 93.  According to Schiltz, if

22

(5:11CV01676)

members of Groups 1 and 2 retired within the appropriate windows, they would "basically get the entire pre-December 9, 2003 program available to them."  Plaintiff's Exhibit 25 at 94; *see* ECF No. 259 at 59.  Schiltz explained at trial that the Union was motivated by fairness concerns.  ECF No. 259 at 61.  Because the Company and the Union had decided to negotiate a new CBA early, in 2003, the Union did not want to "change the retirement rules . . . midstream" for those who would have retired within the 2000-2005 time frame originally contemplated by the CBA that was negotiated in 2000.  ECF No. 259 at 61; *see* ECF No. 252 at 130.

Based on the above, Retirees have satisfied their burden of proving that the 2003-2007 Retirees belonging to Groups 1 and 2 were promised lifetime, company-paid health benefits under the 2003-2008 Welfare Plan, in accordance with the rules applicable to the members of Subclass C.

*ii. Groups 3 and 4*

Unlike the members of Groups 1 and 2, the members belonging to Groups 3 and 4 received substantially less favorable benefits.  Repace testified that members of Group 3 who retired by June 29, 2005, received either (1) "[a]ccess only" to "retiree healthcare"–meaning that members were responsible for the full cost of the healthcare, or (2) a $10,000 lump sum payment if the members waived their right to health benefits.  ECF No. 252 at 131, 133.  A Group 3 member who retired after June 5, 2005, and was at least 55 years old and had 10 years of service, however, was promised the Comprehensive Plan.  ECF No. 252 at 132-33.  Under the Comprehensive Plan, the retiree was responsible for 20% of the cost of healthcare.  ECF No. 252 and 132.  According to Repace, members of Group 3 were "not entitled to post-65 healthcare, just pre-65."  ECF No. 252 at 133.  Repace also testified that the members of Group 4 were entitled to the Comprehensive Plan up to

23

(5:11CV01676)

the age of 65, and were required to pay a graduating percentage of the cost depending on the number of pension credits earned by the date of December 31, 2003. ECF No. 252 at 134-136.

Based on Repace's testimony, it is evident that the members of Groups 3 and 4 were not promised retiree health benefits for life. As Retirees concede, the retiree health benefits of Groups 3 and 4 are only "vested until age 65 . . . ." ECF No. 260 at 76. The Court notes, however, that a retiree's membership in Groups 3 and 4 is tied to his or her right to receive a pension. On the basis of the "tying" inference to which the Sixth Circuit adheres, the Court finds that the members of Groups 3 and 4 who are entitled to company paid health benefits are entitled to receive those benefits beyond the expiration of the 2003-2007 CBA up to the age of 65 under the terms of Exhibit 5. Similarly, the Court finds that those members of Group 3 who are not entitled to company-paid health benefits are nevertheless entitled to participate in "retiree healthcare" beyond the expiration of the CBA until the age of 65, but they are required to pay the full cost of the premiums.

### iii. Groups 5 and 6

Repace testified that the members of Groups 5 and 6 received the same benefit, that is, they received "access only to pre-65 retiree healthcare"–meaning they were permitted to participate in a retiree benefit plan up to the age of 65 but they had to pay for the full cost of that healthcare. ECF No. 252 at 136-138. Repace also opined that he did not believe there was anybody within the umbrella of Group 6. ECF No. 252 at 138. Unlike the members of Groups 3 and 4, the health benefits of Groups 5 and 6 members were not tied to their eligibility to receive a pension.

Based on Repace's testimony and the language of Exhibit 5, the Court finds that the members of Groups 5 and 6, to the extent there exist any, are not entitled to lifetime, company-sponsored

24

(5:11CV01676)

health benefits, nor are they guaranteed "access" to those benefits beyond the expiration of the 2003-2007 CBA.  Although Retirees argue that these retirees "enjoy a vested right to participate in a pre-65 retiree benefit plan but are required to pay the full cost of the premiums"; ECF No. 260 at 76; there are no vesting principles (such as the "tying" inference) within this Circuit or evidence presented at trial to support this argument.  Moreover, there is no language in Exhibit 5 specifying that Groups 5 and 6 members are entitled to "access" to retiree health benefits *until* the age of 65.

### 3. Subclass D Conclusion

The Court finds that: (1) the members of Groups 1 and 2 were promised lifetime, company-paid health benefits under the same rules that applied to the members of Subclass C; (2) with respect to some members of Group 3 and all members of Group 4–they were not promised lifetime health benefits but they are entitled to company-paid health benefits up to the age of 65 in accordance with the terms established in Exhibit 5; (3) with respect to the members of Group 3 who are not entitled to company-paid health benefits–they are nevertheless entitled to participate in "retiree healthcare" until the age of 65 but they are responsible for paying the full cost of the premiums; and (4) the members of Groups 5 and 6, to the extent there are any, are neither entitled to lifetime retiree health benefits nor are they guaranteed "access" to them beyond the expiration of the 2003-2007 CBA.

### C. Subclass A

The Court turns to the health benefits of Retirees who retired between April 18, 1980, and April 19, 1983, whose health benefits are governed by the 1980-1983 CBA.  Notably, no Welfare Plan was negotiated for that contract term.  An internal Hoover memorandum entitled "Benefit Agreement" explained that Hoover and the Union agreed that "[t]here will be no attempt to write a

25

(5:11CV01676)

single document for the 1980-83 [CBA] but rather we will utilize the 1977 document together with the signed amendments . . . ."  Plaintiffs' Exhibit 28.  Schiltz, the Pensions and Benefits Administrator for Hoover during the 1980 contract negotiations, testified that, rather than creating a new Welfare Plan for the 1980-1983 contract cycle, Hoover and the Union decided to continue the Welfare Plan that had been negotiated and implemented in 1977.  ECF Nos. 255 at 9; 259 at 9.

### 1. Contract Language

There is no dispute that the 1977 Welfare Plan did not promise company-paid retiree health benefits.  Rather, it specified that, upon retirement, health insurance benefits will terminate or employees may convert to an individual policy and continue medical coverage "at their own expense."  Joint Exhibit 10 at 7.  Although the 1977 Welfare Plan did not provide retiree health benefits, in 1980, Hoover and the Union signed a Contract Settlement amending the 1977-1980 CBA and specifying that the amendments will be carried forward to the 1980-1983 contract term.  Joint Exhibit 14 at 1.  The amendments included various changes to employee life insurance, pension, and health benefits.  Of particular relevance is Item 6 of the 1980 Contract Settlement, which provides:

6.  Pension-Effective April 19, 1980

a. Monthly pension benefits will increase as follows:

First 15 years of Erisa pension credit=$11.50 for each year of pension credit.

Second 15 years of Erisa pension credit=$12.50 for each year of pension credit.

Over 30 years of Erisa pension credit=$14.00 for each year of pension credit.

b.  Life insurance for all future retirees will be increased from $3,000 to $5,000.

26

(5:11CV01676)

### c. Future Retirees

*The Hoover Company assumes responsibility for paying premiums to the insurance carrier for future retiree's medical insurance in accordance with the terms and conditions of the Plan.*

Joint Exhibit 14 at 3.  According to Schiltz, "the Plan" referenced in Item 6(c) is the 1977 Welfare Plan.  Plaintiffs' Exhibit 28 at 112; *see* ECF No. 259 at 9.  The language of Item 6(c) does not specify a definitive time frame for how long Hoover will pay for future retirees' medical insurance.  In its summary judgment ruling, the Court "[d]iscern[ed] no clear answer in the negotiated documents" as to whether the Company promised lifetime retiree health benefits to employees who retired during the 1980-1983 CBA, and found the extrinsic evidence "point[ing] in both directions," warranting a trial.  *Zino*, 2013 WL 4544518 at *9.

### 2. Trial Evidence

Based largely, again, on the credible testimony of Schiltz, the Court finds that Item 6(c) of the 1980 Contract Settlement granted the 1980-1983 Retirees a lifetime entitlement to company-paid health benefits.  Although Schiltz did not attend the 1980 contract negotiations, he testified that he was kept informed of the negotiations between the Company and the Union, as well as the substance of the agreement reached, so that he could perform the functions of his job as Pensions and Benefits Administrator for Hoover.  ECF No. 259 at 18.  In his Rule 30(b)(6) deposition, Schiltz testified that the 1980 Contract Settlement created a "contractual obligation" on the part of the Company to fund health benefits for the 1980-1983 Retirees.  Plaintiffs' Exhibit 25 at 123.  Schiltz testified at trial that the intention between the Company and the Union was for retirees, including the 1980-1983 Retirees who compromise Subclass A, to receive health benefits "for life."  ECF No. 255 at 90.

27

(5:11CV01676)

Thomas Cook, the Union's Chief Spokesperson during the 1980 negotiations, similarly testified that Company negotiators Jim Cook and Frank Provo made "numerous" statements to him that retiree healthcare was being offered as "a lifetime benefit."  ECF No. 251 at 71-72.  Repace also testified that the Company and the Union arrived at an agreement in 1980 to provide retiree health benefits for life.  ECF No. 252 at 93.  Repace was a member of the Union's negotiating committee and reviewed the contract language in preparation for the 1980 negotiations.  ECF No. 252 at 89, 93.

Schiltz acknowledged the inconsistency between Item 6(c) of the 1980 Contract Settlement and the language of the 1977 Welfare plan specifying that no retiree health benefits were available. He testified, however, that the agreement reached in 1980 regarding the provision of retiree health benefits did not make it into the Welfare Plan in effect for that year.  ECF No. 259 at 7.  Schiltz also testified that even though there were "conflicts" in the 1980-1983 CBA, the Company honored "its agreement in the [CBA] to . . . begin paying for those retiree benefits."  ECF No. 259 at 9.

Consequently, the Court finds that the ambiguity within Item 6(c) regarding the duration for which the Company agreed to fund retiree health benefits, and the conflict between Item 6(c) and the 1977 Welfare Plan, are resolved by the evidence presented at trial proving that the Company and the Union intended for the 1980-1983 Retirees to receive retiree health benefits for life.  *See Royal, 525 F.3d at 422* (extrinsic parol evidence is used "to resolve conflicting terms and meanings of an ambiguous contract"); *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993) (extrinsic evidence may be used to resolve contractual ambiguities under federal common law).  The Court's finding is strengthened by the undisputed evidence that the 1980-1983 Retirees have continued to receive company-paid health benefits beyond the expiration of the 1980-1983 CBA.

(5:11CV01676)

*Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669, 676 n.6 (6th Cir. 1985) ("the fact that retirees' insurance benefits initially were continued after the collective bargaining agreements expired . . . would be some evidence of the parties' intent"); *Yard-Man*, 716 F.2d at 1481 ("[company's] own course of conduct in continuing retiree insurance benefits after plant closure beyond the point as which insurance benefits could have been terminated for active employees indicates that it did not consider retiree benefits to be tied to the durational limitations of that active group").  Finally, while the application of the *Yard-Man* inference further bolsters the Court's finding by acting like a "thumb on the scales" in favor of vesting; *Bender*, 681 F.3d at 262, that inference supports but is not necessary to the finding made by the Court.  Thus, Subclass A prevails at this stage of the litigation.

In support of its claim that the members of Subclass A are not entitled to lifetime vested health benefits, Whirlpool argues that: (1) the 1980 Contract Settlement does not contain language explicitly vesting retiree benefits; (2) durational clauses in the 1980 Contract Settlement, the 1977 Welfare Plan, and other CBA documents preclude lifetime vesting; and (3) the claims asserted by the members of Subclass A are barred by Ohio's fifteen-year statute of limitations for breach of contract claims.  ECF No. 272 at 11-29.  The  Court addressed, analyzed, and rejected these arguments in its summary judgment ruling, and now rests on its earlier analysis for the purposes of this ruling.  *See Zino*, 2013 WL 4544518 at *8, *19-*20, *24-*25.

Whirlpool also points out that, unlike the CBAs that govern the retiree health benefits of the members of Subclass C and certain groups within Subclass D, the 1980 Contract Settlement does not tie eligibility for retiree health benefits to pension eligibility.  ECF No. 272 at 13.  While the tying inference supplies an additional, significant rationale for the Court's findings in favor of the

29

(5:11CV01676)

aforementioned class members, the absence of the inference with respect to the members of Subclass A does not doom their vesting claims.  As set forth above, Retirees satisfied their burden of proving Subclass A's entitlement to lifetime health benefits through witness testimonies that resolved ambiguous and conflicting language within the 1980-1983 CBA.

In addition, Whirlpool argues that "[t]he key problem for plaintiffs [in Subclass A] is that" the 1980 GIP–and its attendant ROR language–was the "only document[] that detail[ed] the coverage provided to the Subclass A Retirees and their spouses and surviving spouses."  ECF No. 272 at 14.  Under Whirlpool's reasoning, the 1980 GIP (and all later GIPs) must therefore be contract documents whose language, including the RORs, are binding on Retirees.

Whirlpool's argument is unpersuasive.  First, as already discussed in this opinion and in the Court's summary judgment ruling, the GIPs were not negotiated documents.  They were Company booklets that were distributed to employees but that were never incorporated into any of the contractual Welfare Plans.  *Zino*, 2013 WL 4544518 at *22-*23.  Second, the 1980 GIP was not the only document that described the health coverage given to the members of Subclass A.  The 1980 Contract Settlement availed to Subclass A members the coverages described in the 1977 Welfare Plan, including "Group Accidental Death and Dismemberment Insurance" (outlined in § 2.03); "Group Sickness and Accident Insurance" (outlined in § 2.04); "Hospitalization Insurance and Surgical Indemnity" (outlined in § 2.05); and "Major Medical-Dental Expense Indemnity" (outlined in § 2.06).  Joint Exhibit 10 at 3-4.  True, the 1977 Welfare Plan indicated that employees would receive more information about their coverage through "descriptive booklets" such as the 1980 GIP.  Joint Exhibit 10 at 1.  Yet, even the 1980 GIP stated that  its purpose was merely "to describe the

30

(5:11CV01676)

insurance program in language which is plainly understandable." Joint Exhibit 60 at 3. In fact, the

1980 GIP acknowledged that the health insurance program made available by the Company was

"described completely" in other documents, namely, "the Group Contracts GT-46562 and GC-46562

issued by the Aetna Life Insurance Company." Joint Exhibit 60 at 3. In sum, the 1980 GIP was

neither a component of the negotiated 1980-1983 CBA nor was it the sole source of information

describing the Company's health insurance program. It was, rather, a Company-published booklet

which purpose was to explain the health coverage that was (1) promised and outlined in the 1977

Welfare Plan/1980 Contract Settlement, and (2) fully set forth in the group insurance contracts issued

by Aetna. For these reasons, the ROR language contained in the 1980 GIP is not contractual

language and is therefore not binding on the members of Subclass A.[12]

3. Subclass A Conclusion

The Court finds that the ambiguity within Item 6(c) regarding the duration for which the

Company agreed to fund retiree health benefits, and the conflict between Item 6(c) and the 1977

Welfare Plan, are resolved by the evidence presented at trial proving that the Company and the

Union intended for the members of Subclass A to receive retiree health benefits for life. Therefore,

Subclass A prevails at this juncture of the litigation.

---

[12] The existence of the ROR language, and the Union's failure to object to it, is also not
compelling extrinsic evidence that the parties did not intend for retiree health benefits to vest.
*See* § IV(A)(2) of this decision. It does not defeat the proof presented at trial that the Company
and the Union intended to confer lifetime health benefits to the members of Subclass A.

(5:11CV01676)

### D. Subclass B

The health benefits of Retirees who retired after April 18, 1983, but before January 1, 1993, are governed by the 1983-1986, 1986-1989, and 1992-1995 Welfare Plans.  *See* Joint Exhibits 17; 23; 30.  In 1988, the Company and the Union entered into mid-term negotiations and agreed to a BLA that covered the period from 1988 to 1992.  ECF No. 251 at 196; *see* Joint Exhibit 26.  The Company and the Union did not, however, negotiate a new Welfare Plan for that contract term.

### 1. Contract Language

There is no dispute that the 1983-1986, 1986-1989, and 1992-1995 Welfare Plans provided that, with respect to the members of Subclass B, company health insurance will terminate for employees who retire and that such employees may convert to an individual policy and continue medical coverage only at "their own expense."  Joint Exhibits 17 at 9; 23 at 8-9; 30 at 28-29.  In the summary judgment proceedings, Retirees argued that the Subclass B members "gain[ed] their rights" to lifetime retiree health benefits through the 1980 Contract Settlement.  *Zino*, 2013 WL 4544518 at *9*.  Because Retirees did not demonstrate  how the 1980 Contract Settlement, which expired with the 1980-1983 CBA, applied to the members of Subclass B, the Court granted summary judgment in favor of Whirlpool based on the language of the above Welfare Plans.  *Id.* at *10.

Retirees subsequently filed a motion for reconsideration and/or relief from the Court's entry of summary judgment with respect to Subclass B.  *See* ECF No. 261.  Under Fed. R. Civ. P. 60(b), a court has "especially broad" discretion to grant a party relief from a final judgment for any reason that justifies relief.  *Johnson v. Unknown Dellatifa*, 357 F.3d 539, 543 (6th Cir. 2004).

32

(5:11CV01676)

2. Trial Evidence

At trial, Retirees elicited substantial and persuasive testimony explaining how the 1980 Contract Settlement's promise of lifetime retiree health benefits was carried forward to the CBAs negotiated in 1983, 1986, and 1988.  Section XIV(B) of the 1983-1986, 1986-1988, and 1988-1992 BLAs each set forth the following provision: "Any Sub-Agreements which may be, or have been, executed between the parties will be continued to the extent that they are not altered, either in their own provisions, by the provisions of this Agreement, or by mutual agreement."  Joint Exhibits 16 at 67; 22 at 74; 26 at 39.  Gensley, the Union's Chief Spokesperson and President from 1981 to 1990, testified that the "Sub-Agreement" Provision operated in the following way: "everything that we ever did, like retirement [issues], anything that was not addressed at that time [of the negotiations] was moved on to the next contract."  ECF Nos. 251 at 170, 175-76; 252 at 21.  According to Gensley, that was "standard practice" between the Company and the Union.  ECF No. 252 at 29.  Repace was a Union negotiator in 1986 and 1988 and he testified that the 1980 Contract Settlement was a "Sub-Agreement" within the meaning of § XIV(B).  ECF No. 252 at 90, 102.

The testimony of former Union representatives who were at the bargaining table is relevant.  Its weight is significantly increased when it is corroborated by a former high-level Company representative who was also at the bargaining table and whom Whirlpool called as its own witness.  Schiltz, who in 1982 was promoted within the Company to Manager of Pensions and Benefits, and who was promoted again in 1989 to Director of Human Resources, participated in contract negotiations on behalf of the Company in 1983, 1986, and 1988, "particularly related to the benefits issues."  ECF Nos. 255 at 9, 22, 30; 259 at 24.  Schiltz testified that the Sub-Agreement Provision

33

(5:11CV01676)

in the 1983-1986 BLA carried the 1980 Contract Settlement through to the 1983-1986 contract term. ECF No. 259 at 19. According to Schiltz, the practice of carrying forward previous agreements for which no changes were intended was beneficial for both the Company and the Union because it streamlined negotiations, and the practice was contractually ratified once the parties executed the BLA. ECF No. 259 at 19-20. Similarly, Schiltz testified, the Sub-Agreement Provision in the 1986-1988 and 1988-1992 BLAs carried forward the 1980 Contract Settlement to their respective contract terms without change. ECF No. 259 at 21-22, 25. Therefore, according to Schiltz, Hoover "honor[ed] [its] promise" and continued to pay for retiree health benefits after 1988. ECF No. 259 at 25-26. And, when Hoover was purchased by Maytag in 1989, Maytag continued to pay for retiree health benefits due to its "responsibilities [that] came from a contract . . . ." ECF No. 255 at 102.

The Sub-Agreement Provision permitted previous Sub-Agreements to be "continued" so long as they were not "altered, either in their own provisions, by the provisions of this Agreement, or by mutual agreement." Schiltz testified that the 1980 Contract Settlement was brought forward to the 1983-1986, 1986-1988, and 1988-1992 contract cycles without change. ECF No. 259 at 20, 25. Although the revived 1980 Contract Settlement conflicted with language in the 1983-1986 and 1986-1989 Welfare Plans that specified that no company-paid retiree health benefits would be made available, that Welfare Plan language cannot be said to have "alter[ed]" the 1980 Contract Settlement because the same conflict existed when the 1980 Contract Settlement was originally executed. The Court has ruled that, despite the conflict, Retirees successfully proved that the members of Subclass A were contractually promised lifetime health benefits. The Court also finds that, based on the evidence presented, Retirees have also satisfied their burden of proving that the applicable Sub-

34

(5:11CV01676)

Agreement Provisions carried the 1980 Contract Settlement through to the 1983-1986, 1986-1988, and 1988-1992 CBAs, entitling the members of Subclass B to receive lifetime health benefits, as well. Again, the *Yard-Man* inference bolsters this conclusion but is ultimately not necessary to it.

Whirlpool argues that the members of Subclass B are not entitled to lifetime retiree health benefits because: (1) there is evidence that the Company rejected the Union's efforts to insert specific language in the 1983-1986 CBA regarding the availability of retiree health benefits; (2) the BLAs do not define "Sub-Agreements"; (3) the 1983-1986 Contract Settlement contains a so-called "deletion provision" that Whirlpool contends nullifies the carry-over effect of the Sub-Agreement Provision within the 1983-1986 BLA; and (4) the Company and the Union maintained a practice of re-executing prior agreements that they intended to carry over to the next contract cycle.

The evidence shows that in 1983, the Union attempted to insert in the 1983-1986 Contract Settlement language stating: "Group insurance for past and future retirees to remain the same." Defendant's Exhibit 5.  In 1984, the Union also attempted to add Welfare Plan language referencing the provision of retiree health care.  Defendant's Exhibit 42.  The Company's rejection of both proposals creates an inference that the benefits at issue are possibly not vested. Based on the foregoing testimonies of witnesses who participated in the bargaining process, however, and the Company's steadfast provision of retiree health benefits to the members of Subclass B for more than twenty years after the expiration of the applicable CBAs, the Court concludes that the more reasonable inference is that the Company did not wish to add superfluous language concerning a subject that was already covered in the 1983-1986 CBA.  Indeed, the latter interpretation comports

(5:11CV01676)

with Schiltz's testimony that the Union's proposals, though ultimately not adopted, were "reasonable" given "what the Company had agreed to in 1980."  ECF No. 259 and 10.

Next, Whirlpool's argument that the BLAs do not define "Sub-Agreement" is unavailing. Gensley, Repace, and Schiltz all considered the 1980 Contract Settlement to be a Sub-Agreement. Their testimonies are strong extrinsic evidence of the parties' understanding of the term.

The Court is also not persuaded by Whirlpool's interpretation of the so-called "deletion provision" of the 1983-1986 Contract Settlement.  That provision states: "The parties herein agree that the terms of the collective agreement shall include the terms of the previous collective agreement plus any and all amendments, deletions and additions."  Joint Exhibit 18 at 15.  In Whirlpool's view, the failure of the Union and the Company to re-execute a document identical to the 1980 Contract Settlement in 1983-1986, 1986-1988, and 1988-1992, means that its absence is therefore a "deletion" that is carried forward to those contract cycles.

Whirlpool's strained interpretation would swallow any meaning attached the provision.  The essential function of the provision is to adopt the terms of the prior CBA.  To read the provision as nullifying any term not repeated in the new CBA would undermine that basic purpose.  The Court concludes that the correct interpretation is to read the provision as adopting the terms of the previous CBA, including the "amendments, deletions and additions" *previously* made to that CBA during the pendency of its term.  Based on the Court's interpretation, Whirlpool's claim that the 1980 Contract Settlement was "deleted" from the 1983-1986 CBA is without merit.

Somewhat stronger is the evidence proffered by Whirlpool showing that the Company and the Union sometimes re-executed certain agreements from one contract cycle to another without

36

(5:11CV01676)

making any changes to them.  For example, certain exhibits to the 1980 Contract Settlement addressing a variety of subjects, such as the procedures for contracting out work, the maintenance of overtime records, and the installation of showers, were re-executed in substantially identical from in subsequent contract cycles.  *See* Joint Exhibit 14 at 13, 16, 19; *compare* Joint Exhibit 18 at 23, 25, 29.  This practice is seemingly inconsistent with Gensley's testimony that "everything that we ever did, like retirement [issues], anything that was not addressed at that time [of the negotiations] was moved on to the next contract."  ECF No. 252 at 21.

Nevertheless, Whirlpool's evidence is outweighed by the testimonies of individuals on both sides of the bargaining table that the 1980 Contract Settlement was a Sub-Agreement that was carried forward to the 1983-1986, 1986-1988, and 1988-1992 contract cycles.  It is entirely plausible that the Union and the Company viewed a Contract Settlement as Sub-Agreements but did not see exhibits to a Contract Settlement in the same way.  That would explain why the parties sometimes re-executed such exhibits from one contract cycle to the next.  It is also plausible that the Company and the Union did not always behave consistently during contract negotiations.  The evidence borne out at trial was that contract negotiations could be messy and unpredictable.  In 1988 and 2003, the Company and the Union executed CBAs much earlier than anticipated due to unforeseen circumstances. Sometimes they failed to execute a new Welfare Plan or Pension Plan, instead relying on Welfare Plan or Pension Plan previously negotiated.  And, sometimes they executed documents that conflicted with other portions of the CBA, *i.e.*, the 1980 Contract Settlement.

37

(5:11CV01676)

Given the sometimes fickle process by which the Company and the Union endeavored to negotiate, not too much weight should be attributed to their inconsistent behavior. Therefore, the evidence presented by Whirlpool is unavailing.

### 3. Subclass B Conclusion

In light of the evidence established at trial and given the important issue of whether the hundreds of Subclass B members may continue to receive health benefits, the Court grants Retirees' motion for reconsideration and/or relief from entry of summary judgment as to Subclass B.

In addition, the Court finds that Retirees have satisfied their burden of proving that the applicable Sub-Agreement Provisions carried the 1980 Contract Settlement through to the 1983-1986, 1986-1988, and 1988-1992 CBAs, entitling the members of Subclass B to retiree health benefits for life.

### V. **Conclusion**

The Court finds that Retirees have proven the following by a preponderance of the evidence, which proof is not defeated or invalided by the evidence and arguments presented by Whirlpool.

1. The members of Subclass C were promised lifetime, company-paid health benefits under the 1992-1995, 1995-2000, and 2000-2003 CBAs.

2. With respect to Subclass D: (1) the members of Groups 1 and 2 were promised lifetime, company-paid health benefits under the same rules that applied to the members of Subclass C; (2) as to some members of Group 3 and all members of Group 4–they were not promised lifetime health benefits but they are entitled to company-paid health benefits up to the age of 65 in accordance with the terms established in Exhibit 5; (3) with respect to the members of Group 3 who are not entitled

(5:11CV01676)

to company-paid health benefits–they are nevertheless entitled to participate in "retiree healthcare" until the age of 65 but they are responsible for paying the full cost of the premiums; and (4) the members of Groups 5 and 6, to the extent there are any, are neither entitled to lifetime retiree health benefits nor are they guaranteed "access" to them beyond the expiration of the 2003-2007 CBA.

3.  The ambiguity within Item 6(c) regarding the duration for which the Company agreed to fund retiree health benefits, and the conflict between Item 6(c) and the 1977 Welfare Plan, are resolved by the evidence presented at trial proving that the Company and the Union intended for the members of Subclass A to receive retiree health benefits for life.

4.  The applicable Sub-Agreement Provisions carried the 1980 Contract Settlement through to the 1983-1986, 1986-1988, and 1988-1992 CBAs, entitling the members of Subclass B to retiree health benefits for life.  In addition, Retirees' motion for reconsideration and/or relief from entry of summary judgment as to Subclass B is granted.


IT IS SO ORDERED.


  September 19, 2014               /s/ Benita Y. Pearson
Date                                         Benita Y. Pearson
                                             United States District Judge

39